Charles H. Field (CA SBN 189817)
Edward D. Chapin (CA SBN 53287)
SANFORD HEISLER SHARP. LLP
655 West Broadway. Suite 1700
San Diego, CA 92101
Telephone: (619) 577-4253
Facsimile: (619) 577-4250
cfield@sanfordheisler.com
echapin2@sanfordheisler.com

Kevin Sharp (TN SBN 016287. *Pro Hac Vice* forthcoming)
SANFORD HEISLER SHARP, LLP
611 Commerce St.. Suite 3100
Nashville. TN 37203
Telephone: (615) 434-7001
Facsimile: (615) 434-7020
ksharp@sanfordheisler.com

David Sanford (DC SBN 457933, *Pro Hac Vice* forthcoming)
Andrew Miller (DC SBN 1047209, *Pro Hac Vice* forthcoming)
SANFORD HEISLER SHARP, LLP
1666 Connecticut Avenue NW, Suite 310
Washington, D.C. 20009
Telephone: (202) 499-5200
Facsimile: (202) 499-5199
dsanford@sanfordheisler.com
amiller@sanfordheisler.com

David Tracey (NY SBN 5232624, *Pro Hac Vice* forthcoming)
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dtracey@sanfordheisler.com

Attorneys for Plaintiffs and the Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTI HASKINS, LAURA SCULLY, and DONALD J. JANAK, individually and as representatives of a class of similarly situated persons in the General Electric Retirement Savings Plan and the General Electric Savings and Security Program,<br><br>                    Plaintiffs, | **CLASS ACTION**<br><br>**COMPLAINT**<br><br>**'17 CV 1960 CAB BLM** |

1

v.

2

3  GENERAL ELECTRIC COMPANY,
   GENERAL ELECTRIC RETIREMENT
4  SAVINGS PLAN TRUSTEES, and
   DOES 1-30,

5

6                              Defendants.

7

8

9                          **I. INTRODUCTION**

10      1.      Plaintiffs Kristi Haskins, Laura Scully, and Donald J. Janak ("Plaintiffs"),

11  individually and as representatives of a class of similarly situated persons in General

12  Electric's 401(k) Plan a/k/a the General Electric Retirement Savings Plan and its

13  predecessor, the General Electric Savings and Security Program ("Plan") between January

14  1, 2011 and June 30, 2016 ("Class Period"), bring this action under the Employee

15  Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1001, *et seq.* ("ERISA"),

16  against the Plan's fiduciaries: General Electric Company ("GE"), General Electric

17  Retirement Savings Plan Trustees ("GE Plan Trustees"), and DOES 1 through 30 inclusive

18  ("DOES") (collectively, "Defendants"). As described herein, Defendants have breached

19  their fiduciary duties and engaged in prohibited transactions and unlawful self-dealing in

20  violation of ERISA and to the detriment of Plaintiffs. Defendants' harm to Plaintiffs arises

21  from five of the Plan's funds: GE Institutional International Equity Fund ("International

22  Fund"), GE Institutional Strategic Investment Fund ("Strategic Fund"), GE RSP U.S.

23  Equity Fund ("RSP Equity Fund"), GE RSP U.S. Income Fund ("RSP Income Fund")

24  (collectively, "GE Funds") and GE Institutional Small Cap Equity Fund ("Small Cap

25  Fund"). Plaintiffs bring this action to remedy Defendants' harm, unlawful conduct, prevent

26  further mismanagement of the Plan, and obtain equitable and other relief as provided by

27  ERISA.

28

CLASS ACTION COMPLAINT                    2                        17CV_ _ _ _

## II. JURISDICTION AND VENUE

2.      This Court has exclusive jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

3.      This district is the proper venue for this action under 28 U.S.C. § 1391(b) and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because it is the district where the Plan is administered, where at least one of the alleged breaches took place, or where at least one Defendant may be found. All Defendants are subject to nationwide service of process under 29 U.S.C. § 1132(e)(2).

### III. PARTIES

**A. Plaintiffs**

4.      Plaintiff KRISTI HASKINS is a participant in the Plan and a resident of San Diego, California. Plaintiff Haskins suffered harm from her ownership of the GE Funds and the Small Cap Fund during the Class Period.

5.      Plaintiff LAURA SCULLY is a participant in the Plan and a resident of San Diego, California. Plaintiff Scully suffered harm from her ownership of the RSP Equity Fund and Small Cap Fund, among other investments she may have made in other GE Funds, during the Class Period.

6.      Plaintiff DONALD J. JANAK is a participant in the Plan and a resident of Carrollton, Texas. Plaintiff Janak suffered harm from his ownership of the International Fund, RSP Equity Fund, RSP Income Fund, and Small Cap Fund, among other investments he may have made in other GE Funds, during the Class Period.

7.      During the Class Period, Plaintiffs suffered harm from GE's selection of poor- to mediocre-performing investment options. GE's management and administration of the Plan deprived Plaintiffs of the investment returns GE could and should have pursued and earned.

**B. Defendants**

8.      Defendant GENERAL ELECTRIC COMPANY ("GE") is a New York corporation that operates a global digital industrial company and, until 2016, operated an

investment management business through GE Asset Management Incorporated ("GEAM"). GE is the Plan's sponsor and administrator and one of the Plan's fiduciaries. As the Plan's administrator, GE is entrusted with the power to make the Plan's rules and regulations as well as use its discretion to control, manage, and administer the Plan's investment options. GE is obligated to act for the exclusive benefit of the Plan's participants and beneficiaries, select prudent investments for the Plan, monitor their selected investments' performance, and accordingly modify the Plan's investment options to maximize the benefits accruing to the Plan's participants and beneficiaries.

9.      Defendant GENERAL ELECTRIC RETIREMENT SAVINGS PLAN TRUSTEES ("GE Plan Trustees") are fiduciaries of the Plan and were officers of GEAM. GE Plan Trustees were obligated to act for the exclusive benefit of the Plan's participants and beneficiaries, select prudent investments for the Plan, monitor their selected investments' performance, and accordingly modify the Plan's investment options to maximize the benefits accruing to the Plan's participants and beneficiaries. To the extent that GE Plan Trustees delegated any of their fiduciary functions to another person or entity, that person or entity has not been disclosed to Plaintiffs and is also a fiduciary under 29 U.S.C. § 1002(21)(A).

10.     DOE DEFENDANTS 1 to 30 ("DOES") are sued herein under fictitious names because after diligent and good faith efforts, their names, identities, and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiffs. Plaintiffs will make the names or identities of said Defendants known to the Court after the information has been ascertained. Plaintiffs are informed and believe, and based thereupon allege, that each of the Defendants designated herein as a DOE DEFENDANT has taken part in some or all of the matters referred to herein and is thus responsible in some manner for the allegations in this Complaint and is liable for the relief sought herein.

11.     The Defendants are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers, failed to comply with 29 U.S.C. § 1104(a)(1) in the

administration of their duties, and failed to remedy the breach of duties they knew other fiduciaries carried out.

## IV. PRELIMINARY STATEMENT

12.    Plaintiffs and the almost quarter of a million employees who participated in the Plan ("the Plan's participants") during the Class Period are victims of Defendants' failure to uphold their fiduciary duties.

13.    The Plan is a profit-sharing plan that includes a "qualified cash or deferred arrangement" as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) and is subject to the provisions of ERISA. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a). The Plan has over $28 billion in assets and is one of the largest 401(k) plans in the country. The Plan provides retirement income for GE's current and former employees. The retirement income the Plan can provide depends on the amount the Plan's participants invest, the amount the Company contributes on behalf of its employees, and the performance of selected investment options less the investments' fees and expenses. The Plan's fiduciaries exclusively control the investment options selected and the costs of the Plan's investments.

14.    Each year, the Plan's participants collectively invested billions of dollars in the Plan. GE representatives encouraged the Plan's participants at company meetings to invest their 401(k) account assets in GE's proprietary mutual funds, which GEAM managed until July 1, 2016. GE was aware that despite the performance of the proprietary mutual funds it selected for the Plan, GE would stand to earn significant revenues and profits in investment management fees that GEAM would charge the Plan's participants.

15.    The Plan's participants trusted GE to construct a 401(k) plan that prioritized their interests over its profit and that offered superior investment options and world-class investment management. Instead, GE prioritized profit over its fiduciary duty and saddled the Plan's participants with substandard proprietary mutual funds.

16.    As of December 31, 2015, 68% of the Plan's assets comprised GE-related

investment options and approximately 56% of the pooled investment fund options available in the Plan consisted of five of GE's proprietary mutual funds.

17.    The Plan was vital to GE's mutual fund business and the healthy growth of its bottom line. According to public documents, as of December 31, 2015, the Plan owned the vast majority of assets in the following proprietary mutual funds:

| Fund Name | Percentage Owned by the Plan |
|---|---|
| GE Institutional International Equity Fund | 90% |
| GE Institutional Small Cap Equity Fund | 84% |
| GE Institutional Strategic Investment Fund | 75% |
| GE RSP U.S. Income Fund | 75% |
| GE RSP U.S. Equity Fund | 70% |

18.    GE's selection of its proprietary mutual funds for the Plan provided GEAM a constant source of fees and helped inflate the market value of GEAM, which GE sold to State Street for a reported $485 million on July 1, 2016. At the time of the sale, GEAM managed approximately $8 billion of the Plan's assets.

19.    Tainted by self-interest, GE's investment conduct was imprudent and disloyal. GE selected and retained its poor-performing proprietary mutual funds for the Plan when superior investment options were readily available. Moreover, to the detriment of the Plan's participants, GE through GEAM profited from an arrangement where investment sub-advisers managed the Plan for a rate less than the amount GEAM earned from the Plan's participants in investment management fees.

20.    During the Class Period, GE earned hundreds of millions of dollars from GEAM and its management of the Plan, while the Plan's participants whom GE owed a fiduciary duty suffered losses in the hundreds of millions of dollars.

**A. GE Selected and Retained Poor-Performing Proprietary Mutual Funds**

21.    GE selected and retained four of its proprietary mutual funds in the Plan: the International Fund, Strategic Fund, RSP Equity Fund, and RSP Income Fund (collectively,

"GE Funds"). GE Funds' poor performance is demonstrated by comparing GE Funds' annual and rolling investment returns to a broad measure of related market performance.[1] This comparative measure consists of various data points, including: (i) the fund's own broad based securities market index (e.g., the S&P 500 Index); (ii) the funds' rankings and ratings among Morningstar's compilation of hundreds of funds with equivalent investment strategies;[2] and, (iii) the investment leaders' individual funds with an equivalent investment strategy.

22.    Any prudent fiduciary would have viewed each of the following GE Funds during the Class Period as poor investments and would not have selected any of them or would have promptly selected a superior investment option after it underperformed relative to its benchmark:

i.    **International Fund**. The International Fund suffered from chronic underperformance relative to its benchmark and other readily available alternatives dating back to January 2008. In the 9-year period between 2008 and 2016, the International Fund's annual returns fell short of the benchmark every year but 2012 and 2015. During that same period, the International Fund underperformed relative to most of the comparable international equity mutual funds Morningstar identified. In 2010, the International Fund performed worse than 90% of the hundreds of international equity mutual funds available on the market. The International Fund also performed worse than 78%, 87%, and 73% of international equity mutual funds in 2011, 2014,

---

[1] The United States Securities and Exchange Commission recognizes this comparative measure as the prevailing method of evaluating a fund's performance.
[2] Morningstar, Inc. is a leading provider of independent investment research products (e.g., data and research insights on managed investment products, publicly listed companies, and private capital markets) for individual investors, financial advisors, asset managers, retirement plan providers and sponsors, and institutional investors in the private capital markets in North America, Europe, Australia, and Asia.

and 2016, respectively. Morningstar's total number of identified comparators ranged between 339 and 592 mutual funds.

ii.   **Strategic Fund.** The Strategic Fund suffered from chronic underperformance relative to its benchmark and other readily available alternatives dating back to January 2008. In the 9-year period between 2008 and 2016, the Strategic Fund's annual returns were below most of the moderate-risk, target mutual funds Morningstar identified. In 2010, Strategic Fund performed worse than 85% of the hundreds of moderate risk target mutual funds available on the market. The Strategic Fund also performed worse than 81%, 53%, 69%, and 78% of moderate risk target mutual funds in 2011, 2013, 2014, and 2016, respectively. Morningstar's total number of identified comparators ranged between 431 and 727 mutual funds.

iii.   **RSP Equity Fund.** The RSP Equity Fund suffered from chronic underperformance relative to its benchmark and other readily available alternatives dating back to January 2009. In the 8-year period between 2009 and 2016, the RSP Equity Fund's annual returns were below the benchmark in every year but 2009, 2012, and 2013. The underperformance was significant in 2010, 2011, and 2015. During that same period, the RSP Equity Fund underperformed relative to most of the comparable large cap mutual funds Morningstar identified. In 2010, the RSP Equity Fund performed worse than 87% of the hundreds of large cap mutual funds available on the market. In 2011, 2015, and 2016, the RSP Equity Fund ranked in the bottom half of large cap mutual funds. Morningstar's total number of identified comparators exceeded 1,000 mutual funds.

iv.   **RSP Income Fund.** From 2008 through 2010, the RSP Income Fund underperformed its benchmark (i.e., the Bloomberg Barclays U.S. Aggregate Bond Index) by 3.65%. During the same three-year period, the RSP Income Fund also significantly underperformed relative to the comparable mutual

funds of investment leaders (e.g., Vanguard, PIMCO, and BlackRock) in the fixed income asset class. The RSP Income Fund's underperformance relative to comparable fixed income mutual funds continued until July 2016 when GE sold GEAM to State Street.

23.     Any reasonable, disinterested investor monitoring their investments would have viewed these funds as imprudent investments. In fact, from 2011 through 2016, the International Fund suffered significant redemptions as investors sought to distance themselves from this fund and GE's advisory services. Similarly, from 2013 through 2016, the Strategic Fund, RSP Equity Fund, and RSP Income Fund experienced net redemptions as potential new investors sought to avoid these funds and GE's investment advisory services.

24.     As the investment adviser to GE Funds, GEAM—and by extension GE—was or should have been aware of GE Funds' annual investment performance and investor redemptions.

25.     GEAM's poor management of GE Funds should have prompted GE to select a more lucrative investment option for the Plan's participants. Instead, GE retained GE Funds because it stood to benefit from the investment management fees GEAM was collecting from the Plan's participants. GE's self-interest and failure of effort and/or competence cost the Plan's participants at least tens of millions of dollars in fees and poor investment performance every year.

**B. GE Charged the Plan's Participants Unreasonable Fees**

26.     The Small Cap Fund was the only GE proprietary fund that consistently outperformed its benchmark. However, in contrast to its practice with the GE Funds, GEAM did not actively manage the Small Cap Fund's assets. Instead, it hired and negotiated a fee with multiple investment sub-advisers to manage the fund. GEAM collected an investment management fee from the Small Cap Fund's performance and retained for itself the difference between the management fee it collected from the fund and the fee it agreed to pay its investment sub-advisers. From this arrangement, GEAM—

and thereby GE—collected millions of dollars in unreasonable and/or excessive fees for services that GE was ultimately responsible for performing as the Plan's administrator.

27.    As the Plan's administrator, GE owed fiduciary duties to the Plan's participants. By charging excessive fees incident to administering the Plan, GE breached its fiduciary duties and engaged in transactions prohibited under ERISA.

28.    GE flouted its fiduciary duties and wrongfully wasted and mismanaged the Plan's assets. The Plan, as a whole, lost hundreds of millions of dollars due to GE's breaches of fiduciary duties. The approximately 250,000 current and former GE employees who participated in the Plan deserved better from a leading global investment firm that touts its investment acumen.

## V. ERISA'S FIDUCIARY STANDARDS

29.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1), states, in relevant part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

30.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

31.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271-272 n.8 (2d Cir. 1982). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment

may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Advisory Op. 88-16A, (Dec. 19, 1988) (emphasis added).

32.      Under ERISA section 406(b)(1), 29 U.S.C. § 1106(b)(1), "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account."

33.      In measuring fiduciary conduct, courts have made it clear that the key element is the process for considering and examining relevant information. As one court explained, "ERISA § 404(a)(1)(B) requires only that [fiduciaries] vigorously and independently investigate the wisdom of a contemplated investment; it matters not that the investment succeeds or fails, as long as the investigation is intensive and scrupulous and . . . discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan." *Donovan v. Walton*, 609 F. Supp. 1221, 1238 (S.D. Fla. 1985).

34.      Thus, to meet the prudent process requirement, fiduciaries must vigorously and thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained. This means considering competing funds to determine which fund should be included in the plan's investment line-up. "A fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality of competing providers and investment products, as appropriate." 72 Fed. Reg. 60453 (October 24, 2007) (Preamble).

35.      In satisfying these duties, fiduciaries should consider a variety of funds and the expenses associated with the possible funds. *See Tibble v. Edison International*, 49 EBC 1725 (C.D. Cal. 2010) (noting that fiduciaries must engage in a thorough investigation of the merits of an investment and noting that the fiduciaries considered five investment criteria, including the expense ratio, when selecting funds).

36.     Furthermore, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation omitted).

37.     ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. § 1105(a) provides for fiduciary liability for a co-fiduciary's breach: "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

38.     29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

39.     Under ERISA, "[t]he question of loss to the Plan . . . requires a comparison between the actual performance of the Plan and the performance that would have otherwise taken place." *Bierwirth*, 754 F.2d at 1057.

# VI. FACTS APPLICABLE TO ALL COUNTS

## A. The Plan's Investments

40.     As of December 31, 2015, the Plan had approximately $28.5 billion in assets, with approximately $14.5 billion in pooled investment funds. The GE Funds and the Small Cap Fund comprised about 56% of the Plan's assets among pooled investment funds.

| Plan Investments | Value of Plan Investment (as of December 31, 2015) |
| --- | --- |
| GE Common Stock Fund | $11,046,325,391 |
| GE Investment Funds: | |
| GE RSP U.S. Income Fund | $1,856,666,000 |
| GE RSP U.S. Equity Fund | $3,496,467,000 |
| GE Institutional International Equity Fund | $1,151,000,000 |
| GE Institutional Small Cap Equity Fund | $1,101,531,000 |
| GE Institutional Strategic Investment Fund | $595,930,000 |
| Total GE Investment Funds | $8,201,594,422 |
| Non-GE Investment Funds: | |
| Non-U.S. Equity Index Fund | $844,833,545 |
| U.S. Aggregate Bond Index Fund | $645,596,009 |
| U.S. Large-Cap Equity Index Fund | $3,115,339,870 |
| U.S. Mid-Cap Equity Index Fund | $902,027,992 |
| U.S. Small-Cap Equity Index Fund | $576,134,517 |
| U.S. Treasury Inflation-Protected Securities Index Fund | $281,069,727 |
| Total Non-GE Investment Funds | $6,365,001,660 |
| Other Individual Investments | $2,524,200,670 |

41.    GE controlled the menu of investment options that were available to the Plan's participants. Despite the market's many high-quality investment options, GE invested the Plan's assets in five of its proprietary mutual funds. Each of these funds was the exclusive investment option in its respective category of actively managed investment strategy. For example, if a Plan participant wanted to invest in an actively managed large cap strategy, RSP Equity Fund was the only available option.

42.    GE managed each of these proprietary funds for a profit by charging investors—including the Plan's participants—fees for services. The fee revenue and GEAM's management of the Plan's assets enhanced the value of GEAM. GE realized the value of GEAM—$485 million—in its sale to State Street. GE therefore gained profits by including each of these funds in the Plan.

43.    GE's imprudent investment decisions, tainted through a process rife with self-dealing, is evidenced in four principal ways: (A) GE year in and year out retained four poor-performing proprietary mutual funds relative to their stated benchmarks and/or other readily available mutual funds with comparable investment strategies; (B) GE, through GEAM, collected millions of dollars of investment management fees despite GE Funds' poor performance; (C) through the Plan, GE built and prolonged its investment management business, which it then sold to State Street for a reported $485 million; and (D) GE, through GEAM, collected an investment management fee from the Small Cap Fund's performance and retained for itself the difference between the management fee it collected and the fee it agreed to pay its investment sub-advisers. In each case, GE promoted its own business interests at the expense of the Plan's participants.

44.    These incentives tainted GE's investment decisions. GE selected its proprietary funds not based on their merits as investments or because doing so was in the interest of the Plan's participants, but because these products provided significant revenues and profits to GE. The GE Funds and the Small Cap Fund consistently suffered from high fees, poor performance, or both, relative to comparable, readily apparent investment

options. A prudent, loyal fiduciary under these circumstances would not have selected or retained such expensive, poor-performing investments.

**B. GE Failed to Remove Their Poor-Performing Proprietary Mutual Funds**

45.     For the actively managed investment strategies—stock/bond allocation, international equity, and U.S. equity—GE offered participants the single option of a GE proprietary mutual fund geared to that strategy, even though comparable but better-performing investment options were readily available. Indeed, these GE funds were so under-performing—and superior investment options were so readily apparent—that an adequate investigation would have revealed them as imprudent investments.

46.     The Strategic Fund, International Fund, Small Cap Fund, RSP Equity Fund, and RSP Income Fund are known in the industry as "actively managed" funds, which means that each fund's investment objective is to outperform a targeted "benchmark" through superior stock picking skills after accounting for all expenses. "Actively managed" funds stand in contrast to "passively managed" or index funds, which simply buy and hold all the stocks within a given index.

47.     Benchmarks can include broad based securities market indices such as the Standard & Poor's 500 Index ("S&P 500"), or the Morgan Stanley Europe, Australasia and the Far East Index ("MSCI EAFE"). Benchmarks can also include a universe of hundreds and thousands of funds with equivalent investment strategies, such as the Morningstar Moderate Allocation Fund Category. Measuring a mutual fund's performance against an established benchmark is the most recognized method used by investors to assess the success or failure of the mutual fund. When active fund managers succeed in beating their benchmarks, this is commonly referred to as "beating the market."

48.     Three of the proprietary GE funds (i.e., the Strategic Fund, International Fund, and RSP Equity Fund) consistently underperformed relative to not only their benchmarks—and thus the market—but also the *majority* of available alternative funds. Options that were readily apparent included the investment funds offered by highly

reputable groups such as T. Rowe Price, Fidelity, American Funds, and Vanguard/Wellington.

49.     The annual returns of the three funds were regularly below those of their T. Rowe Price, Fidelity, American Funds, and Wellington counterparts. Moreover, Morningstar consistently rated the three Funds in the bottom 50th and 75th percentile among hundreds of funds with equivalent strategies. Accordingly, for each Fund, superior alternative investments were readily apparent such that an adequate investigation would have uncovered those alternatives.

50.     The fourth proprietary GE fund, the RSP Income Fund, consistently underperformed relative to other fixed income asset class mutual funds managed by industry leaders Vanguard, PIMCO, and BlackRock. Accordingly, superior alternative investments were readily apparent such that an adequate investigation would have uncovered those alternatives.

51.     Despite their ongoing underperformance during the Class Period, GE continued to retain the GE Funds when any prudent fiduciary monitoring the Plan would have removed them as early as 2011.

52.     GE stood to, and did, benefit from the fees it charged the Plan's participants for managing the GE Funds. Of course, had GE offered any of the readily apparent better-performing, non-proprietary alternatives, it would have stood to lose tens of millions of dollars, both from a loss of the fee revenue stream worth millions of dollars, and from a reduction to GEAM's reported $485 million price tag in the tens of millions of dollars. Accordingly, the process used by GE to select and maintain its investment options was tainted by failure of effort, competence, and/or loyalty.

53.     Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of the Plan's costs and investment performance versus other available alternatives, comparisons to other similarly-sized plans, and information regarding separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until

shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing the Plan's investments, because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon information and belief and the facts set forth herein.

54.    Below, Plaintiffs describe in detail the performance of the Strategic Fund, International Fund, RSP Equity Fund, and RSP Income Fund.

### 1. Strategic Fund

55.    The Strategic Fund invests primarily in a combination of U.S. and foreign (non-U.S.) equity and debt securities and cash. The Strategic Fund measures relative investment performance by comparing the weighted average performance of U.S., equity, foreign equity, and fixed income securities to three indexes: S&P 500 Index, Barclay's Aggregate U.S. Bond Index, and MSCI AWCI ex-US Index. Given the complexities of trying to apply three different indexes to measure the weighted average of the Strategic Fund's portfolio, Plaintiffs are relying on Morningstar for benchmark data for illustrative purposes. Morningstar has identified the Strategic Fund's benchmark as Moderate Target Risk Index and its fund category as Moderate Allocation.

56.    During the Class Period, the Plan's assets under management in the Strategic Fund ranged between approximately $450 million and $620 million. If a participant in GE's 401(k) Plan sought a balanced-style investment portfolio that allocated between stocks and bonds, the Strategic Fund was the only option available to the participant.

57.    The placement of the Strategic Fund into GE's 401(k) was an important arrangement for GE. The Plan's participants represented approximately 75% of the Strategic Fund's total assets.

58.    For the three-year period from 2008 through 2010, the Strategic Fund was clearly an underachiever relative to its Morningstar Moderate Target Risk Index and the approximately 500 other mutual funds in the Morningstar Moderate Allocation category.

The Strategic Fund also underperformed other well-known, readily available funds with comparable investment strategies (e.g., T. Rowe Price Capital Appreciation Fund, American Balanced Fund, Fidelity Puritan Fund, and Vanguard/Wellington Fund).

59.    From January 1, 2008 through December 31, 2010, the Strategic Fund had a cumulative return of 2.27%. The Moderate Target Risk Index, had a return of 11.91%. The Strategic Fund also performed worse than 55%, 67%, and 85% of the mutual funds within the Moderate Allocation category in 2008, 2009, and 2010, respectively. The T. Rowe Price Capital Appreciation Fund had a return of 19.95%. The American Funds Balanced Fund had a return of 9.95%. The Fidelity Puritan Fund had a return of 11.57%. The Vanguard/Wellington Fund had a return of 11.15%.

60.    During this same period, the Strategic Fund had fees that were 20% higher than the better-performing American Balanced Fund, and 100% more expensive than the better-performing Vanguard/Wellington Fund.

61.    A reasonable investigation in 2010 would have revealed the underperformance of the Strategic Fund. It would have also uncovered these readily-apparent alternative investments that were better performing and in some cases cheaper. In light of the available alternatives, a prudent fiduciary monitoring the Plan would not have offered the Plan's participants the Strategic Fund. But GE did just that.

62.    Investment performance did not improve from there. The Strategic Fund performed worse than 81%, 53%, 69%, and 78% of funds within the Morningstar Moderate Allocation category in 2011, 2013, 2014, and 2016, respectively. Morningstar's total number of identified comparator mutual funds within the category ranged between 431 and 727 mutual funds.

63.    From the beginning of calendar year 2011 through the end of calendar year 2016, the performance of the Strategic Fund was significantly below that of the comparable T. Rowe Price, Fidelity, Vanguard/Wellington, and American Funds.

64.    The chart provided immediately below this paragraph shows the relative annual and cumulative performances of the Strategic Fund and the comparable mutual

funds of T. Rowe Price, Fidelity, Vanguard/Wellington, and American Funds. The underperformance of the GE Fund is striking.

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative |
|------|------|------|------|------|------|------|------------|
| Strategic Fund | -2.56 | 12.85 | 16.78 | 4.88 | -1.18 | 5.52 | +36.29% |
| | | | | | | | |
| T. Rowe Price Capital Appreciation Fund | 3.19 | 14.70 | 22.43 | 12.25 | 5.42 | 8.34 | +66.33% |
| GE +/- | -5.75 | -1.85 | -5.65 | -7.37 | -6.60 | -2.82 | |
| +/- Cumulative | | -7.6 | -13.25 | -20.62 | -27.22 | -30.04 | -30.04% |
| | | | | | | | |
| Fidelity Puritan Fund | .74 | 13.94 | 20.48 | 10.86 | 1.82 | 5.20 | +53.04% |
| GE +/- | -3.30 | -1.09 | -3.70 | -5.98 | - 3.00 | +.32 | |
| +/- Cumulative | | -4.39 | -8.09 | -14.07 | -17.07 | -16.75 | -16.75% |
| | | | | | | | |
| Vanguard/ Wellington Fund | 3.95 | 12.67 | 19.96 | 9.90 | .14 | 11.09 | +57.71% |
| GE +/- | -6.51 | +.18 | -3.18 | -5.02 | -1.32 | -5.57 | |
| +/- Cumulative | | -6.33 | -9.51 | -14.53 | -15.85 | -21.42 | -21.42% |
| | | | | | | | |
| American Funds Balanced Fund | 4.16 | 14.57 | 22.12 | 9.22 | 2.03 | 8.90 | +61.00% |
| GE +/- | -6.72 | -1.72 | -5.34 | -4.34 | -3.21 | -3.38 | |
| +/- Cumulative | | -8.44 | -13.78 | -18.12 | -21.33 | -24.71 | -24.71% |

65.     During this period, the money flowing out of the Strategic Fund exceeded new money flowing into the Strategic Fund, as potential new investors sought to avoid the poor-performing fund and GE's investment advisory services. As the investment adviser to the Strategic Fund, GEAM would have been aware of the redemptions and lack of new sales aside from the reinvestment of dividends by existing shareholders. Despite chronic underperformance and net redemptions, GE continued to offer the Strategic Fund in the Plan.

66.    The funds listed in the tables above are well known, readily available, and easily accessible to all investors. These superior alternative investments were readily apparent such that an adequate investigation and prudent monitoring would have uncovered them. GE would not have had to scour the market to find them, particularly given GE's presence in the investments marketplace. On the contrary, GE would likely have had to scour the market to find an offering as poor-performing as the Strategic Fund.

67.    Nevertheless, GE retained the Strategic Fund in the Plan when any reasonable investor that was monitoring the investment would have weeded it out. GE did so even after it became apparent that its performance was inferior to alternative, readily available funds with an equivalent investment strategy. A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the Strategic Fund from the Plan.

68.    However, GE had business and financial incentives to select and maintain the Strategic Fund in the Plan. Even though the Strategic Fund performed poorly, GEAM— and thereby GE—collected millions of dollars in advisory fees from the fund. Furthermore, the Strategic Fund's fee revenue enhanced the sale value of GEAM, which factored into the reported $485 million price GE received from its sale of GEAM. This by itself is suggestive of improper self-dealing.

69.    Not replacing the Strategic Fund with a better option had a negative impact on participants. Listed in the table below is the hypothetical growth in investment value of a $400 million fund based on the investment performance of each fund for the period beginning six years prior to the filing of this suit through June 30, 2016, the day before GE sold GEAM.

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $400 Million |
|---|---|---|---|
| Strategic Fund | 49.48% | 7.03% | $598 million |

| T. Rowe Price Capital Appreciation Fund | 101.47% | 12.57% | $806 million |
|---|---|---|---|
| Fidelity Puritan Fund | 75.95% | 10.01% | $703 million |
| Vanguard Wellington Fund | 76.52% | 10.08% | $706 million |
| American Funds Balanced Fund | 88.66% | 11.33% | $750 million |

70.    GE's process for selecting, maintaining, and monitoring the Strategic Fund as a Plan investment option was tainted by a failure of effort, competence, and/or loyalty. The Plan's participants suffered millions of dollars in losses as a result of GE's breach of fiduciary duty.

### 2.    *International Fund*

71.    Another chronic underperforming mutual fund option through June 2016 was the International Fund. The International Fund invested primarily in companies located in developed and emerging market countries outside the U.S. The International Fund's prospectus identified the MSCI EAFE Index as it primary benchmark against which the fund compared its investment performance.

72.    If a participant in the Plan sought to invest with an actively managed international large cap strategy, the International Fund was the only option available to the participant. Between 2010 and 2015, the Plan's assets under management in the International Fund ranged between approximately $940 million and $1.3 billion.

73.    The placement of the International Fund into GE's 401(k) was an important arrangement for GE. The Plan's participants represented approximately 90% of the International Fund's total assets.

74.    For the three-year period from 2008 through 2010, the International Fund was clearly an underachiever relative to the MSCI EAFE Index and the approximately 500 other mutual funds in the Morningstar Foreign Large Blend Category. The International Fund also underperformed other well-known, readily available funds with comparable

investment strategies (e.g., T. Rowe Price Overseas Stock Fund, the American Funds EuroPacific Growth Fund, and the Fidelity Diversified International Fund)[3].

75.    From January 1, 2008 through December 31, 2010, the International Fund had a cumulative negative return of -11.51%. The MSCI EAFE Index had a negative return of -3.85%. The International Fund also performed worse than 55%, 70%, and 90% of the over 300 mutual funds within Morningstar's Foreign Large Blend Category in 2008, 2009, and 2010, respectively. On an individual fund level, the Fidelity Diversified International Fund had a negative return of -3.78%; the T. Rowe Price Overseas Stock Fund had a positive return of 2.21%; and the American Funds EuroPacific Growth Fund had a positive return of 8.58%.

76.    A reasonable investigation in 2010 would have revealed the underperformance of the International Fund. It would have also uncovered these readily apparent better-performing, alternative investments. In light of the available alternatives, a prudent fiduciary monitoring the Plan would not have offered the Plan's participants the International Fund. But GE did just that.

77.    The poor performance did not end there. In 2011, 2014, and 2016, the International Fund performed worse than 78%, 87%, and 73% of international equity mutual funds, respectively. Morningstar's total number of identified comparators ranged between 339 and 592 mutual funds.

78.    As the investment adviser to the International Fund, GEAM—and thereby GE—would have been aware of the investment performance of the International Fund on an annual basis, both in terms of its absolute performance and its benchmark, the MSCI EAFE. Each year the International Fund's prospectuses disclosed the fund's annual investment returns relative to the MSCI EAFE. Here are excerpts from the International Fund's prospectuses for each year between, and including, 2008 and 2015:

---

[3] Vanguard does not offer an actively managed fund for this investment strategy.

| Fund | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|
| Fund's Returns | -44.35 | 27.35 | 5.49 | -15.89 | 20.79 | 21.65 | -7.68 | -1.46 |
| MSCI EAFE Index | -43.38 | 31.78 | 7.75% | -12.14 | 17.32 | 22.78 | -4.90 | -0.81 |

79.    Other than 2012, the International Fund underperformed its benchmark every single year. Given these overall investment results, adequate monitoring would have revealed the imprudence of investing in the International Fund. Furthermore, an adequate investigation would have revealed superior, readily apparent funds with an international large cap investment strategy.

80.    From the beginning of calendar year 2011 through the end of calendar year 2016, the International Fund's performance was significantly below that of the comparable funds of T. Rowe Price, Fidelity, and American Funds.

81.    The chart provided immediately below shows the relative annual and cumulative performances of the International Fund and other mutual funds with equivalent investment strategies. The differences are striking.

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative |
|---|---|---|---|---|---|---|---|
| International Fund | -15.89 | 20.79 | 21.65 | -7.68 | -0.46 | -0.97 | 17.44% |
| | | | | | | | |
| T. Rowe Price Overseas Stock Fund | -10.12 | 18.59 | 21.75 | -4.49 | -2.45 | 3.01 | 26.29% |
| GE +/- | -5.77 | +2.20 | -0.10 | -3.19 | +1.99 | -3.98 | |
| +/- Cumulative | | -3.57 | -3.67 | -6.86 | -4.87 | -8.85 | -8.85% |
| | | | | | | | |
| Fidelity Overseas Fund | -15.80 | 25.30 | 26.97 | -3.52 | 8.42 | -1.20 | 40.17% |
| GE +/- | -0.09 | -4.51 | -5.32 | -4.17 | -8.87 | +0.23 | |
| +/- Cumulative | | -4.60 | -9.92 | -14.09 | -22.96 | -22.73 | -22.73% |
| | | | | | | | |
| American Funds EuroPacific Fund | -13.31 | 19.64 | 20.58 | -2.29 | -0.48 | 1.01 | 25.15 |
| GE +/- | -2.58 | +1.15 | +1.07 | -5.39 | +0.02 | -1.98 | |
| +/- Cumulative | | -1.43 | -.36 | -5.75 | -5.73 | -7.71 | -7.71% |

82.     For each fiscal year from fiscal year 2011 through fiscal year 2016, the International Fund suffered massive redemptions as investors sought to distance themselves from the poor-performing fund and GE's investment advisory services. As the investment adviser to the International Fund, GEAM would have been aware of the mass redemptions. Despite chronic underperformance and redemptions, GE continued to offer the International Fund in the Plan.

83.     The funds listed in the tables above are well known, readily available, and easily accessible to all investors. These superior alternative investments were readily apparent such that an adequate investigation would have uncovered them. GE would not have had to scour the market to find them, particularly given GE's presence in the investments market place. On the contrary, GE would likely have had to scour the market to find an offering as poor-performing as the International Fund.

84.     Nevertheless, GE retained the International Fund in the Plan when any reasonable investor monitoring the investment would have weeded it out. It did so even after it became apparent that its performance was inferior to alternative, readily available funds with an equivalent investment strategy. A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the International Fund from the Plan.

85.     However, GE had business and financial incentives to select and maintain the International Fund in the Plan. Even though the International Fund performed poorly, GEAM—and thereby GE—collected millions of dollars in advisory fees from the fund. Furthermore, the International Fund's fee revenue enhanced the sale value of GEAM, which factored into the reported $485 million price GE received from its sale of GEAM. This by itself is suggestive of improper self-dealing.

86.     Not replacing the International Fund with a better option had a negative impact on the Plan's participants. Listed in the table below is the hypothetical growth in investment value of a $1 billion fund based on the investment performance of each fund

for the period beginning approximately six years prior to the filing of this suit through June 30, 2016, the day before GE sold GEAM.

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $1 Billion |
|---|---|---|---|
| International Fund | 22.19% | 3.44% | $1.22 billion |
| T. Rowe Price Overseas Fund | 34.17% | 5.09% | $1.34 billion |
| Fidelity Overseas Fund | 57.03% | 7.93% | $1.57 billion |
| American Funds EuroPacific Fund | 34.10% | 5.08% | $1.34 billion |

87.    GE's process for selecting and maintaining the International Fund as a Plan investment option was tainted by a failure of effort, competence, and/or loyalty. The Plan's participants suffered millions of dollars in losses as a result of GE's breach of fiduciary duty.

### 3.    RSP Equity Fund

88.    The RSP Equity Fund provides yet another example of a poor-performing proprietary fund that GE loaded onto the Plan despite superior, readily apparent alternative funds. The RSP Equity Fund invested primarily in large capitalized U.S. companies. If a Plan participant wanted to invest in an actively managed U.S. large cap stock fund, the RSP Equity Fund was the only option available to the participant.

89.    According to annual 401(k) disclosure statements GE furnished to the Plan's participants, GE measured the RSP Equity Fund's investment results relative to the S&P 500 Index. During the Class Period, the Plan's assets under management in the RSP Equity Fund ranged between approximately $2.4 billion and $3.8 billion.

90.    The placement of the RSP Equity Fund into GE's 401(k) was an important arrangement for GE. The Plan's participants represented approximately 70% of the RSP Equity Fund's total assets.

91.    In 2008 and 2009, the RSP Equity Fund performed favorably against its benchmark, the S&P 500 Index. However, the RSP Equity Fund's investment performance

relative to the S&P 500 Index turned sour in 2010 and never recovered, as illustrated in the chart below:

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| **RSP Equity Fund's Returns** | 10.71 | -2.16 | 16.78 | 35.15 | 13.27 | -2.05 | 10.13 |
| **S&P 500 Index** | 15.06 | 2.11 | 16.00 | 32.38 | 13.69 | 1.38 | 11.96 |
| **Fund +/- Index** | -4.35 | -4.27 | +0.77 | +2.76 | -0.42 | -3.43 | -1.83 |
| **Cumulative** | -4.35 | -8.62 | -7.85 | -5.09 | -5.51 | -8.94 | -10.77 |

92.    In the three-year period between 2008 through 2010, the RSP Equity Fund had an investment return of +7.7%, which was below the investment returns generated by comparable funds managed by T. Rowe Price, Fidelity, Vanguard, and American Funds. For the same three-year period, the T. Rowe Price Institutional Large Cap Growth Fund had an investment return of +8.83%; the Fidelity Large Cap Stock Fund had an investment return of +21.21%; the Vanguard Institutional Total Stock Market Index Fund had an investment return of +9.22%; and the American Funds AMCAP Fund had an investment return of +16.23%.

93.    A reasonable investigation in 2010 would have uncovered these alternative, readily apparent investments and thus revealed the underperformance of the RSP Equity Fund relative to these funds. In light of the available alternatives, a prudent fiduciary monitoring the Plan would not have offered the Plan's participants the RSP Equity Fund. But GE did just that.

94.    The RSP Equity Fund's poor performance relative to the funds offered by T. Rowe Price, Fidelity, Vanguard, and American Funds did not end there. The chart listed below shows the relative annual and cumulative performances of the RSP Equity Fund and the funds offered by T. Rowe Price, Fidelity, Vanguard, and American Funds. Again, the differences are striking.

| **Fund** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **Cumulative** |
|---|---|---|---|---|---|---|---|
| RSP Equity Fund | -2.16 | 16.78 | 35.15 | 13.27 | -2.05 | 10.13 | +71.12% |

| T. Rowe Price Institutional Large Cap Growth Fund | -1.40 | 17.55 | 44.44 | 8.72 | 10.08 | 2.85 | +82.24% |
|---|---|---|---|---|---|---|---|
| GE +/- | -0.76 | -0.77 | -9.29 | +4.55 | -12.13 | +7.28 | |
| +/- Cumulative | | -1.53 | -10.82 | -6.27 | -18.4 | -11.12 | -11.12% |
| Fidelity Large Cap Stock Fund | -1.62 | 20.71 | 39.24 | 10.13 | -3.17 | 16.70 | +81.99% |
| GE +/- | -0.54 | -3.93 | -4.09 | +3.14 | +1.12 | -6.57 | |
| +/- Cumulative | | -4.47 | -8.56 | -5.42 | -4.30 | -10.87 | -10.87% |
| Vanguard Institutional Total Stock Market Index Fund | 1.09 | 16.47 | 33.64 | 12.60 | 0.45 | 12.75 | +77% |
| GE +/- | -3.25 | +0.31 | +1.51 | +0.67 | -2.50 | -2.62 | |
| +/- Cumulative | | -2.94 | -1.43 | -.76 | -3.26 | -5.88 | -5.88% |
| American Funds AMCAP Fund | 0.71 | 16.13 | 37.26 | 12.48 | 1.11 | 9.37 | +77.06% |
| GE +/- | -2.87 | +0.65 | -2.11 | +0.79 | -3.16 | +0.76 | |
| +/- Cumulative | | -2.22 | -4.33 | -3.54 | -6.7 | -5.94 | -5.94% |

95.     During this period, the money flowing out of the RSP Equity Fund exceeded new money flowing into the RSP Equity Fund, as potential new investors sought to avoid the poor-performing fund and GE's investment advisory services. As the investment adviser to the RSP Equity Fund, GEAM would have been aware of the net redemptions and lack of new sales aside from the reinvestment of dividends by existing shareholders. Despite chronic underperformance and redemptions, GE continued to offer the RSP Equity Fund in the Plan.

96.     The funds listed in the tables above are well known, readily available, and easily accessible to all investors. These superior alternative investments were readily apparent such that an adequate investigation would have uncovered them. GE would not

have had to scour the market to find them, particularly given GE's presence in the investments marketplace.

97.      Nevertheless, GE retained the RSP Equity Fund in the Plan when any reasonable investor monitoring the investment would have weeded it out. GE did so even long after it became apparent that the RSP Equity Fund's performance was inferior to alternative, readily available funds with an equivalent investment strategy. A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the RSP Equity Fund from the Plan.

98.      However, GE had business and financial incentives to select and maintain the RSP Equity Fund in the Plan. Even though the RSP Equity Fund performed poorly, GEAM—and thereby GE—collected millions of dollars in advisory fees from the fund. Furthermore, the RSP Equity Fund's fee revenue enhanced the sale value of GEAM, which factored into the reported $485 million price GE received from its sale of GEAM. This by itself is suggestive of improper self-dealing.

99.      Not replacing the RSP Equity Fund with a better option had a negative impact on the Plan's participants. Listed in the table below is the hypothetical growth in investment value of a $2 billion fund based on the investment performance of each fund for the period beginning approximately six years prior to the filing of this suit through June 30, 2016, the day before GE sold GEAM.

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $2 Billion |
|---|---|---|---|
| RSP Equity Fund | 98.07% | 12.25% | $3.96 billion |
| T. Rowe Price Institutional Large Cap Growth Fund | 124.20% | 14.62% | $4.48 billion |
| Fidelity Large Cap Stock Fund | 109.43% | 13.31% | $4.18 billion |
| Vanguard Institutional Total Stock Market Index Fund | 115.03% | 13.81% | $4.3 billion |

| American Funds AMCAP Fund | 115.98% | 13.90% | $4.31 billion |
| --- | --- | --- | --- |

100.    GE's process for selecting, maintaining, and monitoring the RSP Equity Fund as a Plan investment option was tainted by a failure of effort, competence, and/or loyalty. The Plan's participants suffered millions of dollars in losses as a result of GE's breach of fiduciary duty.

### 4.    RSP Income Fund

101.    The RSP Income Fund provides yet another example of a poor-performing proprietary fund that GE loaded onto the Plan despite superior, readily apparent alternative funds. The RSP Income Fund invested primarily in bonds with durations of one year or more. If a Plan participant wanted to invest in an actively managed bond fund, the RSP Income Fund was the only option available to the participant.

102.    The placement of the RSP Income Fund into GE's 401(k) was an important arrangement for GE. The Plan's participants represented approximately 75% or more of the RSP Income Fund's total assets.

103.    According to the RSP Income Fund's annual report, GE measured the RSP Income Fund's investment results relative to the Barclays US Aggregate Bond Index.[4]

104.    During the Class Period, the Plan's assets under management in the RSP Income Fund ranged between approximately $1.8 billion and $2.2 billion.

105.    In the three-year period between 2008 through 2010, the RSP Income Fund had cumulative investment returns of 14.06%, which was 3.65% less than the cumulative return of 17.71% that Barclays U.S. Aggregate Bond Index generated during the same period.

---

[4] The Barclays U.S. Aggregate Bond Index is a market value weighted index of taxable investment grade debt issues, including government, corporate, asset-backed and mortgage-backed securities, with maturities of one year or more. This index is designed to represent the performance of the U.S. investment grade first rate bond market.

106.    The RSP Income Fund's investment return of 14.06% was also considerably less than comparable bond funds managed by large, highly regarded fixed income managers such as Vanguard, PIMCO, and BlackRock. The Vanguard Intermediate-Term Bond Index Fund had a cumulative return of 21.53%. The PIMCO Income Fund had a cumulative return of 34.2%. The BlackRock Total Return Fund had a cumulative return of 15.03%.

107.    A reasonable investigation in 2010 would have uncovered these alternative, readily apparent investments and thus revealed the underperformance of the RSP Income Fund relative to these funds. In light of the available alternatives, a prudent fiduciary monitoring the Plan would not have offered the Plan's participants the RSP Income Fund. But GE did just that.

108.    The RSP Income Fund's poor performance relative to the mutual funds offered by Vanguard, PIMCO, and BlackRock did not end there. The chart listed below shows the relative annual and cumulative performances of the RSP Income Fund and the funds offered by Vanguard, PIMCO, and BlackRock. The underperformance is striking.

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Cumulative |
|---|---|---|---|---|---|---|---|
| RSP Income Fund | 8.01 | 5.87 | -0.85 | 5.83 | 0.34 | 3.50 | 22.70% |
| | | | | | | | |
| Vanguard Intermediate-Term Bond Index Fund | 10.78 | 7.05 | -3.42 | 6.99 | 1.30 | 2.85 | 25.55% |
| GE +/- | -2.77 | -1.18 | +2.57 | -1.16 | -.96 | +.65 | |
| +/- Cumulative | | -3.95 | -1.38 | -2.54 | -3.51 | -2.85 | -2.85% |
| | | | | | | | |
| PIMCO Income Fund | 6.37 | 22.17 | 4.80 | 7.18 | 2.64 | 8.72 | 51.88% |
| GE +/- | -1.64 | -16.3 | -5.65 | -1.35 | -2.3 | -5.22 | |
| +/- Cumulative | | -14.66 | -20.31 | -21.66 | -23.96 | -29.18 | -29.18% |
| | | | | | | | |

| BlackRock Total Return Fund | 4.53 | 10.16 | -0.20 | 8.05 | 0.35 | 3.45 | 26.34% |
|---|---|---|---|---|---|---|---|
| GE +/- | +3.48 | -4.29 | -.65 | -2.22 | -.01 | +.05% | |
| +/- Cumulative | | -0.81 | -1.46 | -3.68 | -3.69 | -3.64 | -3.64% |

109.    Beginning in 2012, the RSP Income Fund suffered from significant mass redemptions as investors sought to distance themselves from the poor-performing fund and GE's investment advisory services. As the investment adviser to the RSP Income Fund, GEAM would have been aware of the redemptions and lack of new sales aside from the reinvestment of dividends by existing shareholders. Despite chronic underperformance and redemptions, GE continued to offer the RSP Income Fund in the Plan.

110.    The funds listed in the tables above are well known, readily available, and easily accessible to all investors. These superior alternative investments were readily apparent such that an adequate investigation would have uncovered them. GE would not have had to scour the market to find them, particularly given GE's presence in the investments marketplace.

111.    Nevertheless, GE retained the RSP Income Fund in the Plan when any reasonable investor monitoring the investment would have weeded it out. GE did so even after it became apparent that the RSP Income Fund's performance was inferior to alternative, readily available funds with an equivalent investment strategy. A fiduciary acting in the best interest of the Plan's participants and with due care would have removed the RSP Income Fund from the Plan.

112.    However, GE had business and financial incentives to select and maintain the RSP Income Fund in the Plan. Even though the RSP Income Fund performed poorly, GEAM—and thereby GE—collected millions of dollars in advisory fees from the fund. Furthermore, the RSP Income Fund's fee revenue enhanced the sale value of GEAM, which factored into the reported $485 million price GE received from its sale of GEAM. This by itself is suggestive of improper self-dealing.

113. Not replacing the RSP Income Fund with a better option had a negative impact on the Plan's participants. Listed in the table immediately below is the hypothetical growth in investment value of a $1.8 billion fund based on the investment performance of each fund for the period beginning approximately six years prior to the filing of this suit through June 30, 2016, the day before GE sold GEAM.

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $1.8 Billion |
|---|---|---|---|
| RSP Income Fund | 20.7% | 3.91% | $2.17 billion |
| Vanguard Intermediate-Term Bond Index Fund | 24.65% | 4.58% | $2.24 billion |
| PIMCO Income Fund | 46.69% | 8.10% | $2.64 billion |
| BlackRock Total Return Fund | 26.67% | 4.93% | $2.28 billion |

114. GE's process for selecting, maintaining, and monitoring the RSP Income Fund as a Plan investment option was tainted by a failure of effort, competence, and/or loyalty. The Plan's participants suffered millions of dollars in losses as a result of GE's breach of fiduciary duty.

**B. The Small Cap Fund Had Unreasonable Fees**

115. The one bright spot, in terms of the Plan's performance, was the Small Cap Fund. However, the Small Cap Fund too violated ERISA. In the case of the Small Cap Fund, GEAM did not actually furnish hands-on investment management of the Small Cap Fund's assets. Instead, it hired and negotiated a fee with multiple investment sub-advisers to manage the fund. GEAM collected an investment management fee from the Small Cap Fund's performance and retained for itself the difference between the fee it collected from the Small Cap Fund and the fee it chose to pay the other investment sub-advisers. Based on the disclosure in the Small Cap Fund's registration statement, GE retained for itself

approximately 30% of the annual .88% investment management fee collected on average assets of about $1 billion per annum during the Class Period.

116.   The placement of the Small Cap Fund into GE's 401(k) was an important arrangement for GE. Investment by the Plan's participants represented approximately 80% or more of the Small Cap Fund's total assets. From this arrangement GEAM—and thereby GE—collected millions of dollars in unreasonable and/or excessive fees for services that GE was ultimately responsible for performing as the Plan's administrator.

117.   As the Plan's administrator, GE owed fiduciary duties to the Plan's participants. By charging excessive fees incident to administering the Plan, GE breached its fiduciary duties and engaged in transactions prohibited under ERISA.

118.   Defendants acted to benefit themselves by using proprietary investment funds managed by GEAM, thereby enriching themselves at the expense of the Plan's participants. Defendants' enrichment on the backs of the Plan's participants through the Plan's poor investment performance and unreasonable fees was not enough. On July 1, 2016, Defendants again furthered their own self-interest by selling GEAM to State Street for a reported $485 million.

119.   By acting for their own benefit rather than solely in the interest of the Plan's participants, Defendants breached their fiduciary duties of loyalty and prudence and engaged in transactions expressly prohibited by ERISA.

## VII. CLASS ACTION ALLEGATIONS

120.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

121.   In acting in a representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan (the "Class"). Plaintiffs seek to certify and to be appointed as a representative of the following Class:

All participants and beneficiaries of the Plan, excluding the Defendants, from 2011 through June 30, 2016 ("Class Period").

122.    This action meets the requirements of Federal Rule of Civil Procedure 23(a) and is certifiable as a class action for the following reasons:

a.    The Class includes approximately 250,000 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

c.    Plaintiffs' claims are typical of the claims of the Class because each was a participant during the Class Period. Plaintiffs and all participants in the Plan were similarly harmed by Defendants' misconduct. As a result of Defendants' self-dealing and imprudence, Plaintiffs and all the Plan's participants suffered from excessive fees, deficient performance, and inadequate investment options. This directly caused each of them substantial monetary harm. Plaintiffs and all other participants' retirement savings are depleted as compared to what they could have realized in a robust and cost-effective Plan.

d.    Plaintiffs are adequate representatives of the Class because each was a participant in the Plan during the Class Period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class, and has engaged experienced, and competent attorneys to represent the Class.

123.    This action may be certified as a class action under Rule 23(b)(1)(A) or (B). Prosecution of separate actions by individual participants and beneficiaries for Defendants' breaches of fiduciary duties would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

124.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiffs seek comprehensive reformation of the Plan to make it a more viable retirement investment option, which will benefit them and the Plan's participants.

125.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

126.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including, but not limited to, Defendants' liability to the Class for their allegedly disloyal and imprudent conduct.

127.     Plaintiffs' counsel, Sanford Heisler Sharp, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## VIII. CAUSES OF ACTION

### <u>COUNT I</u>

**Breach of Duties of Loyalty and Prudence by Mismanaging the Investment Options Selected For and Retained By the Plan During the Class Period (Violation of ERISA, 29 U.S.C. § 1104)**

128.     The allegations set forth in paragraphs 12 through 127 are realleged and incorporated herein by reference.

129.     GE used the Plan as a strategic and financial benefit to recruit and retain workers.

130.     In joining GE and subsequently enrolling in the Plan, GE employees trusted and relied on GE's resources and expertise to construct and maintain a state-of-the-art 401(k) plan.

131.     At all relevant times during the Class Period, the Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and its assets.

132.     29 U.S.C. § 1104(a)(1) requires plan fiduciaries to act "solely in the interest" of plan participants and beneficiaries.

a.   Subsection (A) of this section requires that the fiduciary act for the "exclusive purpose" of providing benefits to plan participants and defraying reasonable expenses of plan administration. 29 U.S.C. § 1104(a)(1)(A).

b.   Subsection (B) adds the duty of prudence, requiring a plan fiduciary to act with the "care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

133.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, defraying reasonable expenses, and administering the plan with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for selecting prudent investment options, eliminating imprudent ones, evaluating and monitoring the Plan's investment on an on-going basis, and taking all necessary steps to ensure the Plan's assets are invested prudently.

134.    Defendants selected and retained the Plan's investment options. The process for selecting and retaining the Plan's investment portfolio options is and has been based on a faulty investment process that was tainted by Defendants' self-interest and imprudence.

135.    The faulty process resulted in a plan loaded with relatively poor-to-mediocre proprietary options which substantially impaired the Plan's use, its value, and its investment performance for all the Plan's participants, past and present. This process included the retention of these proprietary options despite sustained poor relative investment performance.

136.    A prudent investigation would have concluded that the process used by Defendants was causing the Plan to waste hundreds of millions of dollars of the Plan's participants' retirement savings.

137.    The fact that the Plan's poor investment options have caused material relative underperformance constitutes a breach of Defendants' fiduciary duty under ERISA to each and every person who was a participant in the Plan during the Class Period regardless of the investment option in which the participant had actually invested.

138.    In failing to adequately consider better-performing investments for the Plan, Defendants, with respect to the entire Plan, failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

139.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered hundreds of millions of dollars of damages and lost-opportunity costs which continue to accrue and for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

140.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—

### Unreasonable Fees

### (Violation of ERISA, 29 U.S.C. § 1104)

141.    The allegations set forth in paragraphs 12 through 127 are realleged and incorporated herein by reference.

142.    Defendants are responsible for ensuring the Plan's fees are reasonable for the services provided.

143.    GEAM entered into contracts under which it provided investment advisory services to the Small Cap Fund offered on the Plan in exchange for compensation.

144.    However, GEAM did not furnish actual hands-on investment management of the Small Cap Fund's assets. Instead, it hired and negotiated a fee with multiple investment sub-advisers to manage the fund. GEAM then collected an investment management fee

from the Small Cap Fund's performance and retained for itself—and thereby GE—the difference between the fee it collected from the Small Cap Fund and the fee it agreed to pay the other investment sub-advisers.

145.    From this arrangement, GE collected millions of dollars in fee revenue for performing a task that GE was otherwise obligated to perform as the Plan's administrator. In other words, this arrangement allowed GE, indirectly through the Small Cap Fund and GEAM, to receive its own compensation as the administrator of the Plan and to collect unreasonable and/or excessive fees from the Plan.

146.    The GE Plan Trustees allowed GE and GEAM to make a profit from the Plan by retaining the difference between what GEAM collected from the Small Cap Fund and what it paid to investment sub-advisers.

147.    Moreover, the GE Plan Trustees had a potential conflict of interest as employees of GEAM, and failed to expressly consider the potential effect of that conflict of interest on their decision-making.

148.    By using its fiduciary authority to affect their own compensation and by failing to use the excess fees collected from the Small Cap Fund to offset fees the Plan would have otherwise had to pay, Defendants failed to discharge their duties with respect to the Plan:

      a.    Solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan, in violation of 29 U.S.C. § 1104(a)(1)(A); and

      b.    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

149.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages for which

Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

150.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## COUNT III

### Prohibited Transactions Concerning Investment Management
### and Administrative Services Fees
### (Violation of ERISA, 29 U.S.C. § 1106)

151.    The allegations set forth in paragraphs 12 through 127 are realleged and incorporated herein by reference.

152.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits fiduciaries from causing plans to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest.

153.    ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits fiduciary self-dealing.

    a. Subsection (1) provides that a fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."

    b. Subsection (2) provides that a fiduciary shall not "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or

represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

    c.   Subsection (3) provides that a fiduciary shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

154.    Defendants caused the Plan to utilize the Small Cap Fund.

155.    Throughout the Class Period, Defendants dealt with the assets of the Plan in their own interest and for their own account when they caused the Plan to pay unreasonable investment management fees to GEAM. Under the arrangement with the Small Cap Fund, GEAM charged the fund a separate investment management fee, investment advisory fee, or similar fee.

156.    Accordingly, Defendants engaged in prohibited transactions as follows:

    a.   By causing the Plan to engage in transactions that they know or should know constitute direct or indirect transfers of the Plans' assets to, or use of the Plans' assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. § 1106(a)(1)(D); and

    b.   By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of 29 U.S.C. § 1106(b)(1); and

    c.   By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan, in his individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of its participants or beneficiaries, in violation of 29 U.S.C. § 1106(b)(2); and

    d.   By causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of 29 U.S.C. § 1106(b)(3); and

e.  By causing the Plan to pay a separate investment management fee, investment advisory fee, or similar fee violated the terms of Prohibited Transaction Exemption 77-3.

157.    Pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to restore all losses suffered by the Plan as a result of these prohibited transactions and disgorge all revenues received and/or earned directly or indirectly by GE resulting from the above-mentioned prohibited transactions or received in connection with the management of the Plan's assets or other services performed for the Plan for more than reasonable compensation.

## COUNT IV

### Breach of Duties of Loyalty and Prudence by Failing to Remove or Replace Certain GE Proprietary Funds as 401(k) Plan Investment Vehicles
### (Violation of ERISA, 29 U.S.C. § 1104)

158.    The allegations set forth in paragraphs 12 through 127 are realleged and incorporated herein by reference.

159.    Defendants breached its duties of loyalty and prudence by selecting and then failing to timely remove as Plan investment options each of the GE Funds—i.e., the Strategic Fund, International Fund, RSP Equity Fund, and RSP Income Fund.

160.    The GE Funds exhibited poor performance during and before the Class Period. GE profited from the Plan by causing the Plan to retain GE's own poor-performing proprietary funds.

161.    A prudent investigation not tainted by self-interest would have revealed to a reasonably prudent fiduciary that the GE Funds were inferior to other readily apparent investment options. GE's conduct reflects a failure to consider and obtain better-performing alternative, unaffiliated funds at the expense and to the detriment of the Plan.

162.    Had a prudent and loyal fiduciary conducted such an investigation, it would have concluded that the GE Funds were selected and retained for reasons other than the best interest of the Plan and were causing the Plan to waste hundreds of millions of dollars

of employees' retirement savings in underperformance relative to prudent investment options available to the Plan.

163.    Defendants committed these breaches during each of the meetings of the GE Plan Trustees that occurred periodically during each year of the Class Period. At each of these meetings, the GE Plan Trustees had cause to remove the GE Funds based on their poor performance, but failed to do so. A prudent fiduciary would have removed the GE Funds from the Plan.

164.    As a direct and proximate result of these breaches of fiduciary duties, the Plan and each of its participants have suffered millions of dollars of damages and lost-opportunity costs which continue to accrue and for which Defendants are jointly and severally liable pursuant to 29 U.S.C. § 1109. Pursuant to ERISA, 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

165.    Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties; and knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under ERISA section 409, 29 U.S.C. § 1105(a).

## COUNT V

### Failure to Monitor Fiduciaries

166.    The allegations set forth in paragraphs 12 through 127 are realleged and incorporated herein by reference.

167.    As alleged above, GE is a fiduciary under 29 U.S.C. § 1002(21), and thus bound by the duties of loyalty and prudence.

168.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not doing so.

169.     To the extent that the GE Plan Trustees managed the assets of the Plan, GE's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

170.     The GE Plan Trustees monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

171.     The Defendants breached their fiduciary monitoring duties, *inter alia*, by:

    a.  failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

    b.  failing to ensure that the monitored fiduciaries considered the ready availability of comparable investment options for the Plan;

    c.  failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent investments; and

    d.  failing to remove options that did not even keep up with a majority of funds with comparable investment strategies, all to the detriment of the Plan's participants.

172.     As a consequence of Defendants' breaches of their fiduciary duty to loyally and prudently select investments and monitor their performance, the Plan failed to accrue hundreds of millions of dollars of additional investment performance and moreover suffered very substantial losses. Had Defendants discharged their fiduciary monitoring duties loyally and prudently as described above, the losses suffered by the Plan would have been avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, Plaintiffs and the Plan's participants lost hundreds of millions of dollars.

173.    Pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a), Defendants are personally liable to make good and restore to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and are subject to other equitable or remedial relief as appropriate.

## IX. PRAYER FOR RELIEF

174.    Plaintiffs, on behalf of the Plan's participants and beneficiaries, respectfully request that the Court:

A.    Find and declare that the Defendants breached their fiduciary duties as described above;

B.    Find and adjudge that Defendants are personally liable to make good to the Plan $700 million in losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C.    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

D.    Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

E.    Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

F.    Reform the Plan to render it compliant with ERISA;

G.    Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

H.    Certify the Class, appoint Plaintiffs as class representatives, and appoint Sanford Heisler Sharp, LLP as Class Counsel;

I.    Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and/or the common fund doctrine;

J.    Order the payment of interest to the extent it is allowed by law; and

1

    K.    Grant other equitable or remedial relief as the Court deems appropriate.

2

3

Dated:  September 26, 2017        Respectfully Submitted,

4

5

6

7                     /s/ Charles Field

                     Charles H. Field, CA Bar No. 189817

8                     Edward Chapin, CA Bar No. 053287

9                     **SANFORD HEISLER SHARP, LLP**

                     655 W. Broadway, 17th floor

10                    San Diego, CA 92101

11                    Phone: (619) 577-4251

                     Facsimile: (619) 577-4250

12                    cfield@sanfordheisler.com

13                    echapin@sanfordheisler.com

14                    Kevin H. Sharp (*Pro Hac Vice* forthcoming)

15                    **SANFORD HEISLER SHARP, LLP**

                     611 Commerce Street, Suite 3100

16                    Nashville, TN 37203

17                    Phone: (615) 434-7000

                     Facsimile: (615) 434-7020

18                    ksharp@sanfordheisler.com

19                    David Sanford (*Pro Hac Vice* forthcoming)

20                    Andrew Miller (*Pro Hac Vice* forthcoming)

                     **SANFORD HEISLER SHARP, LLP**

21                    1666 Connecticut Avenue NW, Suite 310

22                    Washington, D.C. 20009

                     Telephone: (202) 499-5200

23                    Facsimile: (202) 499-5199

24                    dsanford@sanfordheisler.com

                     amiller@sanfordheisler.com

25

26                    David Tracey (*Pro Hac Vice* forthcoming)

27                    **SANFORD HEISLER SHARP, LLP**

                     1350 Avenue of the Americas, 31st Floor

28                    New York, NY 10019

Phone: (646) 402-5650
Facsimile: (646) 402-5651
dtracey@sanfordheisler.com

*Attorneys for Plaintiffs and the Proposed Class*